We have been ready to Detention of Lester Collier, 4080922 for the Appellant. We have Betsy Deer and for the Appellee, Sherry Wong. Ms. Deer, I hope you're feeling better. Thank you. Glad to see you. Alright, please proceed. It is Mr. Collier's position that he is not asking you to re-weigh the evidence or re-try this case. When you look at the evidence and the light most favorable to the State, the evidence is still, in significant part, fabricated. At trial, we had two stipulations during the testimony of the State's two witnesses that the testimony that they gave, that they had relied on a statement from a 22-year-old victim given a report in 1998, that that statement did not exist. It was nowhere in the documents that either of the doctors had an opportunity to review. And both doctors testified that they considered this victim's statement when they made the diagnosis that Mr. Collier had, the diagnosis of paraphilia. And within the facts of that case and that diagnosis, I do want to make a distinction. In 1998, Mr. Collier committed the offense of criminal sexual assault. It was a forcible offense, clearly against the victim's will. But that does not answer the question whether or not Mr. Collier has paraphilia. It answers the question that this is a crime. And it answers the question, obviously, that it's a sex crime. But the diagnosis of paraphilia requires urge, fantasies, behaviors. And in this particular case, the motivating factor is this non-consent. And when you look at the facts in this case, the only evidence that you have about the circumstances of that offense is what Mr. Collier says. He was 15 years old. He was hanging out with a 22-year-old woman. He had the impression that this 22-year-old woman was flirting with him, was interested in him, said yes. He was aroused. And then she said no. He's 15 years old. He's not been raised right by any stretch of the imagination. And he forces her to have sex. But the arousal occurred prior to the force. And the non-consent was not the triggering urge in this particular case. And there's no evidence to suggest otherwise, except for that fabricated evidence from both of the doctors. I'm not sure I understand what you mean by the fabricated evidence. What are you referring to? I'm referring to Dr. Sear's testimony in particular, that he read a victim statement. The 22-year-old victim in that 1998 sex offense, he read a statement. And on direct examination, there was an objection to the foundation. And so he had to clarify. He said yes, he definitely read the statement. He's not sure where he read it in all these documents. Maybe it was a police report. Maybe it was a PSI. But he's certain. So the statement's attributed to this woman? Yes. Okay. Then, on cross-examination, he readmitted to that. He's, yes, he definitely, he read the statement. At which time, the state and I stipulated the fact that this statement, this written statement that the doctor was referring to, does not exist. That was the stipulation. It doesn't exist. And I'm characterizing it as fabricated. I don't know how else you can characterize it. Well, did you ask the doctor about it? I'm sorry? Did you ask the doctor about it further? Yes. When, where, how, whose statement? Yes. There was complete understanding between both parties that it was impossible for the doctor to have referred to this written statement. That was, because it didn't exist. It just didn't exist. And this is not in a situation where I, the state refers to the Erb case where there's what the court called alleged infirmities. I would submit that this is not an alleged infirmity. It's a proven infirmity, proven by the state and the respondent by that stipulation. Nor is this a simple matter, again, as the state suggests, a discrepancy in the source of information. I would argue that a discrepancy occurred when the doctor first testified as to where he located this written statement. Was it in the PSI? Was it in a police report? Was it in a medical report? That would be a discrepancy. But there is no discrepancy. There's agreement. It's proven. The source of this written statement, this alleged written statement, does not exist. It's an alleged statement, not an alleged infirmity. So wasn't this fully explored at the trial before the jury? Yes. Yes, it was. Let me put it this way. Both of the doctors, Dr. Swear more obviously, but even Dr. Rita testified about this victim's statement, which is incredible. It's puzzling. How did these two experts come up with the same fabrication? I am not in any way suggesting that they lied. I have no evidence, no reason to believe that they did lie. It's a myth in the case. But if you consider, if it was a lie, if you knew that this doctor lied about this particular statement because it helped reinforce the basis for his diagnosis of paraphernalia, if you knew that he had lied, first of all, the state wouldn't have put him on to testify. And the judge wouldn't have accepted his testimony. And if you knew he lied, I would submit to you that you would strike that evidence. Was all of the evidence or just the evidence about the statement? It is a significant aspect of this case because we have actually two sex offenses. The one when he was 15 and the one when he was 21. And both doctors testified that these two, what they call non-consensual sex offenses, support the diagnosis of paraphernalia. And in order to do that, they have to have a way of determining whether or not that first offense was in fact consenting or non-consenting. It's critical. Well, wasn't he convicted of rape? Yes. Then what's the issue? Sorry? Then what's the issue? Well, the issue is, first of all, in the SBP statute, the facts of convictions for sexually violent offenses do not support a diagnosis. They in and of themselves are not the evidence. No, you're saying, do we know whether it's consensual or non-consensual? You can't be convicted of rape for consensual sexual intercourse. Exactly. So then what's the issue? The issue is what I apparently was inarticulate about previously, and that's the distinction. He committed that crime, that forceful, non-consenting crime. Sometimes otherwise known as rape. Yes, yes, absolutely. Okay. I don't know what this forceful non-consenting, you know. How about we call it, he raped her? I didn't know the Illinois law did that, but I'll call it rape in here. Okay. Okay. I think that's common parlance, mother's tongue and all that. Absolutely, that's fine. Okay. Here's the distinction. The non-consenting part. Was his sexual urge based on the non-consent, or was his sexual urge based on, he's 15 years old, he has impulse control problems. As he says, he's sexually aroused by this woman, and she says no, and... So this is a mitigation, right? No, no, no, no. It is not... I don't understand the distinction you're seeking to draw here, Counsel. That we're talking about a mental health diagnosis, not a crime. We're talking about a mental health diagnosis that requires, in this particular case, diagnosis of paraphilia, that his urges are based on non-consenting victims. And if this rape was the result of him being sexually aroused because rape sexually arouses him, then there would not be an issue. If this rape was a result of his being let on, not respecting no, the 22-year-old comes on to him, and he's 15, and as I said, hasn't been raised right, and then forces her. What was the urge? What was the arousal? It was the flirtation. It was the come on. It was, you know, and the crime occurred because he's a criminal, but not because he has that mental disorder. What part of the fictitious statement addressed any of this in the doctor's testimony? When the doctor testifies that she said that she wasn't interested, that she didn't lead him on, that it was non-consensual from the time that the sexual encounter was initiated. So she had led him on until he decided he wanted to have sexual intercourse with her, and she said no, and then he raped her. Yes. That's not paraphilia? No. Where does that appear in the record? Who said that? Which expert? Neither of the experts said that. Well, and I didn't study Dr. Witherspoon's testimony that closely because of the standard. I would argue that when the experts tell you what the qualifications or the factors are for this particular diagnosis, and then they feed you evidence that supports that diagnosis, and then it's learned that that information didn't exist, that there's no more support for that diagnosis. There was a defense expert who testified. Yes. Did he say that she led him on until she said no, and then he raped her, that that would not be paraphilia? Not in those words, no, sir. In what words, if not those? I regret that I did not, as I said, I was focusing on the standard, which was. . . This seems to be the entire focus of your argument. I'm just trying to figure out from whence it comes that this parsing of the stages of raping a woman makes a difference in the diagnosis of paraphilia. It's not intuitive with me, so I'm thinking there must be some expert witness who explained this, and you apparently tell me now no one did. I regret, Justice Steinman, that I do not have immediate recall of what Dr. Witherspoon's testimony was regarding that point. Other than the business that you've described about that she'd lead a bond before being raped, before not, whatever that means, is there some other aspect of the woman's statement that the doctors had considered that you say was frictional that was probative to any of the issues before the jury? I'm sorry? Is there some other aspect of the woman's statement that the doctors had considered that was probative of any of the issues before the jury? No, that was probative only on the issue of consent and what motivated the urges. It was only . . . Which is probative as to . . . The diagnosis. The diagnosis, except no one so explained. No expert said. I don't want to be cute about this. No expert said, well, you know, by gosh, if she had led a bond up to this point, and then he wants to have sex with her and she says no, and then he rapes her, that's not paraphilia as opposed to if he had decided he was just going to rape her from the beginning. Am I correct? That is absolutely correct. Then what's this argument all about? Are we supposed to intuit that this is a difference? I do not think that it is a matter of intuition. I think it is a matter of when the doctors posit that this is the circumstance that supports their diagnosis, and that circumstance does not exist anymore, then that diagnosis is not based on facts. It's not based on the data. Let me ask you a question. This trial, did the victim testify? No. There have been SVP cases in the past where there have been victims testify. No, I mean at the criminal trial, did the victim testify? No, he pled guilty. Ah, I'm sorry, no, in that case . . . The 22-year-old was 15. That case went to trial, but we don't have any of the facts. Well, I'm wondering whether this myth, as you call it, of the case, whether it could have been a transcript of the criminal trial that the doctors had. No, it doesn't exist. We didn't have it. I'm not saying you didn't have it, I'm saying maybe the doctors did. The doctors didn't have it. Did you ask to look at their records? Yes, I asked the doctors to go through their records, and I asked Dr. Swearer to go through his record, and he said he didn't bring it. And then the state and I agreed that, and in consultation with Dr. Swearer, because there was a lot of activity that occurred outside the courtroom, but that those documents that we had in discovery were the documents that the doctor had, and the only documents that the doctor had. So he ultimately acknowledged he was wrong when he said he considered this statement from the woman? Yes. Did Dr. Rita also? Yes. Dr. Rita was not as, I was not as effective in cross-examining Dr. Rita on that point as I might have been with Dr. Swearer. Not that I'm saying I was effective with Dr. Swearer. What I'm saying is that I did not explore that to the extent that I should have with Dr. Rita. So it's not as clear in the record he didn't refer to the things that he had relied upon. But he did say that he had referred to the victim's statement that he said at some point, which was quick to report the offense. And there's no evidence of that at all. There's nothing in any of the documents that, excuse me, anything about the victim in that case that either of the doctors would have had access to. And there was a similar stipulation with Dr. Rita's testimony. How long was the jury out? I'm going to tell you four hours. I think it may have been a little bit longer. It was longer than most of the SVP cases that I'm aware of. And Mr. O'Brien said that it was the longest that he'd had. Who's Mr. O'Brien? Mr. O'Brien. O'Brien? Yes. He is? He was counsel for the Attorney General's office. I think he, along with Dr. Walsh, that the jury was out for a long time. I think that when you look at Dr. Swearer's testimony combined with Dr. Rita's, which in the brief I describe as nonsense, and I outline the details in which respondent regards the testimony as nonsense. I did want to highlight that, though, with one particular point, which is what Dr. Rita described in deciding that Mr. Collier was a high-risk reoffend, that his grooming behavior was violent behavior. And I would just suggest that, first of all, grooming behavior is sexual behavior. It is not non-sexual. What behavior are you saying? The grooming behavior, where Mr. Collier was excessively nice to the 13-year-old victim in the second offense. He was accommodating. He gave her rides to school. They talked music. He was, as Dr. Rita described him, aggressively pleasant and accommodating. And he characterizes this as non-sexual violence towards the 13-year-old. And as I stated, grooming behavior is sexual. And grooming behavior, by definition, is the opposite of violent behavior. It's that accommodating, nice, creepy wooing that child molesters engage in. That when you look at, I think, the absurdity of Dr. Rita's testimony, combined with, I think, a significant aspect of manufactured evidence, that the jury's verdict is based on prejudice. It's based on the two sex offenses and not on the evidence. Thank you very much. Thank you, Ms. Greer. Ms. Wong? Good afternoon, Your Honors. Counsel. May it please the Court. My name is Sherry Wong, and I'm an Assistant Attorney General here on behalf of the people of the State of Illinois. Your Honors, on appeal, Respondent, even though, as argued today, is not challenging the, is not asking this Court to reweigh the evidence or retry the Respondent. The arguments today, she's asking this Court to do just that. Respondent is challenging the credibility determinations that were made by the jury, and in doing so, is asking this Court to substitute its judgment for that of the prior effect. The jury here heard all of the evidence, and after hearing the evidence, found the testimony of the people's experts to be more credible than that of the Respondent's experts. By finding the Respondent to be a sexually violent person, they implicitly credited the people's expert testimony over that of the Respondent's experts. Are the representations, Ms. Greer, made regarding the testimony of the physicians and the nonexistent report correct? Your Honor, it is correct that there were no victim statements in any of the documents that the doctors reviewed prior to trial, but it is not correct that the testimony was in any way fabricated. What happened was Dr. Sweare testified that the victim had stated that force was exercised during the course of the 1998 aggravated criminal sexual assault offense. And then he was asked where he had learned this certain information. He said he reviewed the documents that were in the master file. These included police reports, probation records, mental health records, and things that are usually included within those types of reports are victim statements. And he probably learned that the victim exercised force by looking at all of these documents. The parties later stipulated that there were in fact no victim statements included in any of the documents that the doctors reviewed. This point was made to the jury, the jury heard this, and then the doctor later on in redirect examination testified that even though there were no victim statements, the fact of the conviction, the fact that the respondent had been convicted of aggravated criminal sexual assault, which by its nature involves the use of force and the lack of consent, he inferred from the fact of the conviction, from the prosecution of the respondent, that the respondent had exercised force against the victim and that she did not consent to the sexual intercourse. Was it on direct examination or cross-examination that the doctor referred to the victim statements? It was on direct examination, Your Honor. And then on cross-examination he again reiterated that he believed that he had learned part of this information from reviewing the documents which would have included a victim statement. So the assistant AG asked the doctor to explain what matters he considered in reaching his opinion? That's correct, Your Honor. And on redirect examination and also on closing arguments, the people acknowledged that the doctor had made a mistake in recalling where he had learned certain information. How many items did the doctor mention in his response to the question of things he had considered? Three or four. He mentioned probation reports, he mentioned police records, mental health records, and then went on to talk about, you know, these would have also included victim statements. And then later the parties established that there were in fact no victim statements. Well, counsel, what's troubling about all this is it's such a shocking bit of prosecutorial malpractice to put a witness on the stand and apparently be introduced to him for the first time. It was as recently as yesterday. A little aside, I teach a course at the University of Illinois College of Law talking about how you have to prepare for trial and how you have to talk to your witnesses and find out what they're going to say. This is pretty shocking stuff. Certainly, Your Honor, it was a mistake on the part of the doctor to not have... No, not on the part of the doctor. And also on the part of... On the part of the lawyer who called the doctor, didn't know what the doctor was going to say, and who, if he had said, yeah, in the victim statements prior to trials, excuse me, doctor, because I know what I've provided and I know your case, there are no victim statements here. That's correct, Your Honor. And it was a mistake that the people acknowledged at trial and it was argued to the jury. And the trial... And it happens with the second doctor as well? Not explicitly with the second doctor. The second doctor testified that the victim had stated that there was no, that she was not sexually, that the victim was not sexually interested in the respondent. And Dr. Reda had testified that one of the things that he had looked at to come to that particular conclusion was, again, these victim statements. But he had not explicitly... Counsel, this isn't mock trial. I mean, this is someone's life. We're talking about putting him in jail for a long time. This is about as shocking a demonstration of prosecutorial malpractice as I think I've ever heard. I'm astonished. And certainly, Your Honor, we acknowledge that the state could have better prepared Dr. Swearer regarding his testimony and reviewing the documents prior to trial. But, again, the jury heard all this information, and to the extent that the doctor's testimony was impeached on this one particular point, the jury was free to disregard Dr. Swearer and Dr. Reda's testimony. You were the trial lawyer, I take it? I was not the trial lawyer. Okay. Is the trial lawyer now handling tax objections for the Attorney General? No, Your Honor. The trial lawyer is still with the SDP.  Division. Who was it? It was Assistant Attorney General Patrick O'Brien. My question is to what extent was the misassumption that both of the state's experts had read victim statements, which led them to believe that the aggravated criminal assault policy, a crime of violence, was not engendered to some degree by the come-on of the victim towards the defendant? How did that affect the psychometric nature of their evaluations? Because these are, they get like a box of forms and little tests, and they go through and check boxes and add up the scores, and their opinion is driven by the scores that they get on these little tests. Okay? So if they had in their mind, oh, this 22-year-old girl was completely blameless, and this was just like this kid came up and thumped her on the head and had sex with her, that's one kind of a crime. But if there was a dalliance going on, and he could not control himself, control the urges that were generated and unleashed, that's a different score. And if the scores are out of whack, what does that do to their ultimate conclusion? Well, this respondent's argument here goes to whether or not the respondent suffered from a mental disorder. So in terms of whether or not we're looking at the static 99 scoring, the Minnesota test scoring, that goes to the third element as to whether or not he's substantially likely to sexually re-offend. As to whether or not he suffers from a mental disorder, the doctors looked at the documents that were in the master file, and they looked at the fact of the conviction, and the victim's prosecution of the respondent for that offense. They also looked at the interview with the respondent, where the respondent admitted to both doctors that his actions were a crime, that he knew that his actions were a crime, and that also when he came on to this woman, and the woman sexually rejected him, that enraged him, and that was when he forced himself upon her. Well, but isn't there a qualitative, that's a terrible word to use in this context, but isn't there a qualitative difference between forcing yourself on a woman who had been rejecting advances, and forcing yourself on a woman who had made advances, and then at the penultimate moment said no? Well, to the extent that... I mean, if you're looking at whether or not, I mean, obviously both examples are a crime, as Ms. Buehrer freely admits, but the question is when you're trying to do a diagnosis of whether or not somebody is, by reason of his psychological makeup, a sexually violent person, that seems to be a pretty important difference that gets scored differently on the psychometric measures, correct? That's possible, Your Honor. Both of the doctors testified that when the respondent made these advances towards her and she rejected him, that made him upset, and that after she rejected him, that is when he... But my point is, did the sexual urge, was it generated by the victim, or was it generated internally by the respondent? And when we're talking about whether or not you're a sexually violent person, we're not talking about the act, we're talking about the urge. So where did the urge come from? That's correct, Your Honor. And if both of your experts said the urge was generated from within the respondent with no help from the victim, that means he's a really bad guy and needs to get locked up. But if they were wrong on that essential point because they believed that they had read something in a phantom document somewhere, what does that do ultimately to their opinion? Your Honor, they both testified that the respondent suffered from paraphilia, which requires the sexual urges with respect to non-consenting persons. They did not explicitly link the non-consent to whether or not it was internal within the respondent or whether or not it was the rejection of the respondent. Is that what you're getting at, that link? Well, to the extent that the experts did not testify to that, the respondent never made that argument at trial, and also Dr. Witherspoon never made that particular argument during his direct examination either. It was perfectly reasonable for these doctors to testify that the respondent suffered from paraphilia given the information that they had available to them. They had the doctors, they had the master file, they had the fact that And that's not affected by the information that they thought they had but didn't? Well, there's no dispute. There's no dispute regarding the underlying facts that there was force exercised here and that the victim did not consent to the sexual intercourse. Those facts were fully explored at trial, and to the extent that the respondent takes issue with where the information came from, she was fully able to explore that issue before the jury. The jury was given a stipulation to this effect. This was argued to the jury during closing arguments numerous times throughout the course of closing arguments. And also the jury was again given another instruction before they began to deliberate that they could consider a witness's memory regarding the accuracy of their testimony and the credibility of their testimony. So the jury was aware that there was this factual mistake on the record, and they could disregard or credit Dr. Rayden and Dr. Sears' testimony as they saw fit. And here they found the people's expert's testimony to be more credible than that of the respondent's expert. And it should be noted that the respondent made this exact same argument in the trial court in his motion for a new trial. And the trial court in denying that motion explicitly stated that he did not believe that the doctors had fabricated their testimony. And this can be found in Volume 18, Pages 15 and 16 of the record. Rather, what the doctors, they simply misrecalled where they learned certain information. And the trial court specifically stated that this type of error was not so grave as to justify overturning the jury's decision. That argument and, quite frankly, the comments of Judge Schering mystify me to a certain extent because they couldn't remember exactly which evidence they had looked at, but it's stipulated by both sides that the evidence, this piece of evidence that they both relied on, never even existed. That's correct. So how can you misremember something that never existed? Well, they attributed a certain piece of information to information that was available in another document. What document was that? The fact of the conviction, which was available in the police reports. No, no, no. I agree with you. The conviction is there, and it's a conviction for a violent offense. There's no question. The fine point that I think Ms. Beer is trying to make, and that I'm trying to make, is that it's the genesis of the urge, not the violent act, but the genesis of the urge. Was it internal with the respondent, which means that he truly is a person who has an illness that needs to be kept away from society, or was it generated by an external force in the guise of a 22-year-old girl? And that's a really big distinction in my mind. And doctors did not specifically testify as to that particular nexus. They did testify that the respondent met the criteria for paraphilia. Does the criteria include the fact that this urge was generated by him rather than by her? The criteria for paraphilia is that over a six-month period, the individual has to experience sexual urges, fantasies, or behaviors, and has to then act on those sexual urges, fantasies, or behaviors. And the doctors testified that the respondent experienced these sexual urges. He obviously was attracted to this 22-year-old victim and then acted on these. Paraphilia also involves non-consenting persons. That's to be sexual urges and fantasies with respect to non-consenting persons. Here the doctors testified that the victim was not interested in the respondent. How did they know that? They based it on the fact of the conviction. And based on the respondent's own statements to them during the interview. The respondent admitted during his interview that he knew that his actions were a crime. He intimidated the victim into having sexual intercourse with him. Right, but who developed the urges? Was it by her flirting? Or did he just see a young woman and say, this is my target? First, I would not agree that there was any flirting involved in the underlying offense. But it's unclear from the record whether or not the urge came from within him. See, I don't know that for the purposes of criminal liability, where the urges came from doesn't really matter. But for the purposes of determining somebody to be a sexually violent person, I think that's the penultimate question. Your Honor, both of the experts testified here that the respondent suffered from paraphilia. Based on their clinical experience, based on their training, and even though they did not make it explicitly clear. And based on an assumption that because he pled guilty to criminal sexual assault, the urges originated with him. Based on, not from a misassumption, based on the fact that the conviction, based on the documents that they had, and their interviews, and the respondent's own statements. And to the extent that there are these questions that arise, the respondent was fully able to explore these issues to the jury during closing arguments and on cross-examination. And did in fact acknowledge that he was able to explore these issues and asked Dr. Swearer about these statements. Was able to ask Dr. Swearer and Dr. Rada about this nexus. It did not come up at trial, so this issue was not particularly explored before the jury. And the jury was free to accept or disregard the doctor's statements and their diagnosis. But chose to credit their testimony over that of Dr. Rader's. Now with respect to Dr. Rader's testimony, the same point applies. The respondent was able to fully explore Dr. Rader's testimony about his definition of non-sexual violence before the jury. And did in fact acknowledge that although there was no concrete force that was involved during the grooming process, he believed that there was a subtle type of force and aggressive intimidation involved in the grooming process. And the respondent does not dispute that grooming can be a factor that can be considered in determining whether the respondent is substantially likely to sexually re-offend. And to the extent that he takes issue with the doctor's definition of non-sexual violence or whether or not he met any of the criteria of whether or not he was substantially likely to sexually re-offend, he was able to again explore those issues before the jury. And did in fact do so numerous times during closing arguments and during cross-examination. If Your Honors have no further questions, the evidence here was more than sufficient to establish that the respondent was a sexually violent person. And we would ask that this Court affirm the judgment of the Circuit Court. Thank you. Thank you, Ms. Wong. Ms. Beard, rebuttal. I think as a point of clarification, and perhaps I misheard, respondent is not conceding anything about grooming behavior and how it gets factored into risk analysis. The issue regarding grooming behavior came up as an example. Dr. Rita says up is down and white is black and nice behavior is violent. And if that were the only point where Dr. Rita was strange in his testimony, then I would concede the credibility issue. And that the jury looked at it that way and discarded it. But there were so many different points that I point out in my brief. Where, again, up is down. And then you put that in the context of his references to what he knows about the 22-year-old victim and how she felt and how that factors into his diagnosis. And you combine that with Dr. Swearer's testimony about what he knows about this 22-year-old victim and that his knowledge is based on nothing. And you put that all together, this verdict cannot stand. It's not credible. And while... You're not asking for a new trial because of the improper evidence. You're just telling us that we should set aside the verdict entirely in reverse. I am. And I hope that wasn't a mistake because I certainly, you know, alternatively than if, you know, a retrial is better than, you know, affirming. But yes, I think that based on the evidence as it is. So with the witnesses being impeached as they were, and if Dr. Rita was as nonsensical and contradictory as you assert, how do you explain the jury verdict? Prejudice. Against whom? Against people who commit sex offenses. You know, you don't do a plea with a sex offender when someone's going to go to jail for, you know, 10 years on a burglary, and your sex offender's going to get five years. Counsel, you're looking at a bench that has close to 40 years trial court experience. I can't speak for my colleagues, but I suspect they've had the same experience I've had of taking not guilty verdicts in sex offense cases. Oh, absolutely. Absolutely. I understand. Well, then what happened there? Well, because he was guilty of these two sex offenses. And then the question is, is are we going to let a sex offender out on the street? And then I would submit to the court that, you know, sex offenders are having difficulty finding places to live anymore because they have to be 100, 500 feet from so many different places that they live under bridges. There's a real prejudice against sex offenders, right or wrong. There's a prejudice. And I think that given the quality of the evidence presented by the state's witnesses taking into consideration the prejudice against people who do commit sex offenses. Let me ask it this way. Other than this one glaring mistake, what is there about the testimony of these two doctors that the jury could not accept and believe and based thereon decide that your client was a sexually violent person? That experts can testify of what they believe based on the facts in front of them. They can make reasonable inferences based on the facts. But when they start believing in facts and making up facts, then. Well, this is arguably a stronger case for the respondent than it would have been had none of this occurred in the first place, isn't it? I mean, what happened here is they said, oh, you know, that's, we now understand that that wasn't something we could consider. But we still have the same opinion that he's a sexually violent person and here's why. I mean, you're, from a technical point of view, you're better off with them having raised their, included in their opinion, the fictitious reports first, then argue that they're not capable of being believed. But, I mean, given, given if the jury says, well, you know, that was a mistake and we're going to disregard it, which they're entitled to do, what about the remaining part of the testimony was insufficient if believed by the jury to sustain the verdict the jury returned? Because it goes to diagnosis and diagnosis is critical in the consideration and the diagnosis of paraphilia is not sufficiently established based on the evidence that they used this evidence to support a diagnosis and then learned that what evidence doesn't exist. So, yes, I understand. The jury couldn't be permitted to conclude what they did on this evidence. That's what you're asking us to conclude, isn't it? I'm sorry. I'm talking when you were. The jury shouldn't have been permitted to return this verdict because the jury was favorable to the state. The remaining evidence just cannot be sufficient because these physicians have been so impeached. Yes. Yes. And, again, what I'm saying is what if he had lied? What if you knew he had lied? Wouldn't you reverse that? This is a liar. Counsel, did you go through the doctor's documents? Yes. Were they admitted to evidence? The doctor's evaluations were admitted to evidence. Of the things they relied on. The things they were relying on that you asked him about in court. You asked the two doctors about. I didn't offer anything other than the stipulation because there was nothing. If I'm following, I. Well, what I was. Were there all those documents for the jury to go through? We did not do that. I'm not saying for the jury to go through. To be in the record. For us to be in the record. No, I'm sorry, Justice. I thought the state's agreement and my agreement would establish the fact that these don't exist. Well, they establish they don't exist, but they don't establish that this information is not in these other documents the doctors were relying on. Was there anything in those other documents that said she came on to me? Or he said she came on to me? Yes. All three doctors in their reports. Something to that effect. That this is his recollection of what happened. They had a relationship. You know, 22-year-old piling around with a 15-year-old. And they're, you know, walking the streets together. So the doctors did have that information. Yes, but it was based on his statement. Was there anything in those documents from the doctors about what the victims said? No. There's no police reports regarding that case. There's no. Did the doctors testify that the victims said something? Yes. And what did they say the victims said? I memorized it. On page 12 of my brief, Dr. Swearer says, forced by the victim's account. What is that an answer to? Asked about the diagnosis of paraphilia and what was the basis for the paraphilia. Dr. Swearer says, what leads me to that was Mr. Collier's history of non-consenting contact. We have two convictions that pertain to him having contact with persons who are non-consenting. In one case, use of intimidation by his account, forced by the victim's account. So he's referring to the victim's account. Okay. Thank you very much.